### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| **ESTATE OF CRAIG L. ALLARD,** | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| **v.** | ) | *No. 2:11-cv-283-DBH* |
| | ) | |
| **PATRICK J. FLEMING, et al.,** | ) | |
| | ) | |
| *Defendants* | ) | |


### RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT

On March 29, 2009, Craig L. Allard, a resident of Westbrook, Maine, died as a result of injuries sustained the previous day on the Maine Turnpike.  Three Maine State Police defendants, Colonel Robert Williams, Phillip Alexander, and Roger Teachout, (the "state defendants") move jointly for summary judgment in this action alleging violation of the civil and constitutional rights of the decedent.  Motion for Summary Judgment by Defendants Colonel Robert Williams, Phillip Alexander, and Roger Teachout ("State Motion") (ECF No. 45).  The remaining, individual defendant, Aaron Phinney, the driver of the van that struck Allard, also moves for summary judgment.  Defendant Aaron Phinney's Motion for Summary Judgment ("Phinney Motion") (ECF No. 48).  I recommend that the court grant the motion of the state defendants and grant Phinney's motion in part.

### I.  Applicable Legal Standard

### A.  Fed. R. Civ. P. 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Rodríguez-Rivera v. Federico Trilla Reg'l Hosp. of Carolina*, 532 F.3d 28, 30 (1st Cir. 2008) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Santoni,* 369 F.3d at 598. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(c). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

**B. Local Rule 56**

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and

2

supported by a specific record citation. *See id.* The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c). The nonmovant likewise must support each denial or qualification with an appropriate record citation. *See id.* The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id.* The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id.*

Failure to comply with Local Rule 56 can result in serious consequences. "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(f). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id.*; *see also, e.g., Sánchez-Figueroa v. Banco Popular de P.R.*, 527 F.3d 209, 213-14 (1st Cir. 2008); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

## II.  Factual Background

The parties' statements of material facts, filed in compliance with Local Rule 56(b) and

(c), include the following undisputed material facts.

On March 29, 2009, Craig L. Allard, a resident of Westbrook, Maine, died as a result of injuries he sustained on March 28, 2009, on the Maine Turnpike in York County, Maine. Statement of Material Fact[s] by Defendants Colonel Robert Williams, Phillip Alexander, and Roger Teachout ("State SMF") (ECF No. 46) ¶ 1; Plaintiff's Opposing Statement of Material Facts and Statement of Additional Material Facts in Opposition to Defendants' Motions for Summary Judgment ("Plaintiff's Responsive SMF") (ECF No. 53) ¶ 1.[1]  At all relevant times, defendants Phillip Alexander and Roger Teachout were members of the Maine State Police acting under color of law. *Id.* ¶ 3.  At all relevant times, defendant Colonel Robert Williams set the policies and procedures for the Maine State Police. *Id.* ¶ 4.

At all relevant times, defendant Aaron M. Phinney was a resident of New Gloucester, Maine, and the owner and operator of a 2001 GMC Savanna panel truck. *Id.* ¶ 5.[2]

At approximately 1:30 p.m. on March 28, 2009, defendant Alexander was in his cruiser at the York Toll Plaza when he observed a black Ford Expedition with a Maine registration but without a front registration plate, traveling north.  *Id.* ¶ 7.[3]  Alexander activated the blue emergency lights on his cruiser and initiated a traffic stop of the Expedition at approximately mile 10 northbound.  *Id.* ¶ 8.  The driver of the Expedition produced a Maine driver's license identifying him as Craig Allard. *Id.* ¶ 9.

The only passenger in the Expedition stated that he owned it and produced a vehicle registration identifying him as Brett Pearce.  *Id.* ¶ 11.  Pearce also produced a Maine driver's

---

[1] The plaintiff's objection to this paragraph of the state defendants' statement of material facts, that it contains "multiple facts in violation of . . . Local R. 56(b)," is overruled.
[2] The plaintiff's objection to this paragraph of the state defendants' statement of material facts, that it contains "multiple facts in violation of . . . Local R. 56(b)," is overruled.
[3] The plaintiff's objection to this paragraph of the state defendants' statement of material facts, that it contains "multiple facts in violation of . . . Local R. 56(b)," is overruled.

license and a photographic Cumberland County jail identification card.  *Id*. ¶ 12.  Pearce told Alexander that they were returning from a trip to Foxwoods in Connecticut.  *Id*. ¶ 13.

Alexander ran background checks on both Pearce and Allard and learned that both had extensive criminal histories including drug convictions, and that Allard was subject to current bail conditions.  *Id*.  ¶ 14.  Those bail conditions included random searches of Allard's person and vehicle.  *Id*. ¶ 15.  Alexander also spoke with defendant Teachout, who called him when he heard radio traffic to the effect that Alexander was engaged in a traffic stop and seeking information about the occupants of the vehicle.  *Id*. ¶ 16.[4]

Teachout told Alexander that he had recent information that Pearce was trafficking heroin, and that he was en route to talk with Pearce and to assist Alexander.  *Id*. ¶ 17.  An informant had provided Teachout with a nickname, a physical description, a home address, and a telephone number for Pearce, and stated that he or she had seen Pearce with as much as six to eight "fingers" of heroin, that Pearce had previously been arrested for trafficking in drugs, and the he drove a black Ford Expedition.  *Id*. ¶ 18.[5]  The day before the stop, Teachout drove past the home address and saw the black Expedition registered to Pearce parked there.  *Id*. ¶ 19.

After speaking with Teachout, Alexander requested the assistance of a drug canine unit.  *Id*. ¶ 20.  Alexander then returned to the Expedition, where Allard complied with his request to get out of the vehicle.  *Id*. ¶ 21.  Once outside the vehicle, Allard admitted that he was on bail for drug possession and that he had previously been on probation for drug violations.  *Id*. ¶ 22.  He was visibly shaking, taking deep breaths, and appeared nervous.  *Id*. ¶ 23.  He acknowledged that he was subject to bail conditions and consented to searches of the vehicle and himself.  *Id*. ¶ 24.

---

[4] The plaintiff's objection to this paragraph of the state defendants' statement of material facts, that it contains "multiple facts in violation of . . . Local R. 56(b)," is overruled.
[5] The plaintiff's objection to this paragraph of the state defendants' statement of material facts, that it contains "multiple facts in violation of . . . Local R. 56(b)," is overruled.

Pearce said that he knew that Allard was on bail, that he himself had a previous heroin trafficking conviction, that both of them were "clean," and that they had known each other for some time after meeting in a drug rehabilitation program. *Id.* ¶¶ 25-26.[6]  Pearce told Alexander that there was no contraband in the Expedition. *Id*. ¶ 27.  Alexander told Pearce that he was going to search the Expedition, and Pearce responded that he knew that Alexander had a job to do. *Id*. ¶ 28.[7]  Pearce did not protest or question Alexander's intent to search the vehicle. *Id*. Alexander searched the Expedition for weapons and contraband and found an expandable metal baton in the map compartment behind the passenger's seat, but nothing of import to a drug investigation. *Id.* ¶ 29.  He then allowed Allard and Pearce to get back into the Expedition. *Id*. ¶ 30.

Alexander then spoke briefly with Teachout, who arrived three minutes later. *Id.* ¶¶ 31-32.  Allard said that he was shivering because he was cold, so Alexander allowed Allard to sit in his cruiser. *Id*. ¶ 33.  Teachout first spoke with Pearce, who said that he did not have any drugs on him and that there were no drugs in the vehicle. *Id*. ¶ 34.  Teachout then spoke with Allard, who could not produce any receipts showing that the men had been to Foxwoods. *Id*. ¶ 35. Allard also said that there were no drugs in the vehicle. *Id*.

By this time, Trooper Forbes had arrived with his drug canine, which conducted a sniff search of the vehicle. *Id*. ¶ 36.  Shortly thereafter, Teachout was informed that a passing motorist had contacted the York police and reported observing the individual closest to the woods at the traffic stop throwing something over his shoulder. *Id*. ¶ 37.  Teachout asked Forbes

---

[6] The plaintiff's objection to paragraph 25 of the state defendants' statement of material facts, that it contains "multiple facts in violation of . . . Local R. 56(b)," is overruled.
[7] The plaintiff's objection to this paragraph of the state defendants' statement of material facts, that it contains "multiple facts in violation of . . . Local R. 56(b),'" is overruled.

to search the area near where Pearce had been standing.  *Id.* ¶ 38.[8]  Forbes and his dog searched the area and retrieved a cigarette pack.  *Id.*  Teachout looked into the cigarette pack and saw what appeared to be three "fingers" of heroin.  *Id.* ¶ 39.[9]  He knew that a "finger" of heroin is approximately 10 grams.  *Id.*

Teachout then arrested Pearce and put him in Teachout's cruiser.  *Id.* ¶ 40.  At this time, approximately 2:15 p.m., Alexander arrested Allard, placing him in handcuffs.  *Id.* ¶ 41.  Allard remained in Alexander's cruiser.  *Id.*  Teachout administered the *Miranda*[10] warning to Pearce, who immediately waived his rights to counsel and to remain silent.  *Id.* ¶ 42.  Pearce said that he had paid $3,000 for the heroin to a supplier in Massachusetts, whom he named, and that he could easily get another three "fingers" of heroin.  *Id.* ¶ 43.[11]  Pearce also spoke of other drug trafficking activity that he knew about.  *Id.*

The log of the state police dispatch center's communications with respect to this incident shows that the Expedition was stopped at 1:34 p.m. and that the call from the York police conveying the information from the anonymous passing motorist came in at 2:09 p.m.  *Id.* ¶ 46.[12]

After the heroin was found, Allard became visibly nervous and was shaking.  *Id.* ¶ 47.  He began crying and told Alexander that he needed to "help himself out" and talk to the "drug police."  *Id.* ¶ 48.  Alexander told Allard that he would make arrangements for Allard to speak with drug agents, and he contacted the Maine Drug Enforcement Agency.  *Id.* ¶ 49.  Plans were made to transport both Allard and Pearce to the Maine State Police Troop A Barracks in Alfred

---

[8] The plaintiff's objection to this paragraph of the state defendants' statement of material facts, that it contains "multiple facts in violation of . . . Local R. 56(b)," is overruled.

[9] The plaintiff's objection to this paragraph of the state defendants' statement of material facts, that it contains "multiple facts in violation of . . . Local R. 56(b)," is overruled.

[10] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[11] The plaintiff's objection to this paragraph of the state defendants' statement of material facts, that it contains "multiple facts in violation of  . . . Local R. 56(b)," is overruled.

[12] The plaintiff's objection to this paragraph of the state defendants' statement of material facts, that it contains "multiple facts in violation of . . . Local R. 56(b)," is overruled.

for interviews with drug enforcement agents.  *Id.* ¶ 50.  Allard calmed down after learning of these plans.  *Id.* ¶ 51.

While arrangements were being made to tow the Expedition, Alexander noticed that Allard had changed his position in the rear seat of the cruiser so that he was behind the driver's seat with his back toward the rear left door and his legs stretched across the back seat toward the right rear door.  *Id.* ¶ 52.  When they were ready to depart for the Alfred Barracks, Alexander told Allard that he was going to move him from the back seat to the front seat where he would be more comfortable. *Id.* ¶ 53.[13]

Alexander went to the rear driver's side door, opened it, and stood over it.  *Id.* ¶ 54.  As Alexander assisted Allard out of the car, and Allard was about an arm's length away, Alexander began to shut the cruiser door.  *Id.* ¶ 55.   All of a sudden, Allard ran out into oncoming traffic.  *Id.* ¶ 56.[14]  Alexander recalls a vehicle sounding its horn and making an evasive maneuver as he "instinctively" reached out to grab Allard, "just out into the travel lane," only to brush against Allard's clothing.  *Id.* ¶ 57.[15]  Alexander said to Allard, "What are you doing?"  *Id.* ¶ 58.  He did not receive a reply.  *Id.*

Alexander got out of the travel lane.  *Id.* ¶ 59.  He could see traffic approaching while Allard continued out into the middle lane of I-95.  *Id.*  He testified that Allard was "focused" on a white box truck northbound in the middle lane.  *Id.* ¶ 60.  Defendant Phinney was the operator of the white box truck.  *Id.* ¶ 61.  As Phinney was travelling northbound on I-95 and approached the top of a hill, he saw a black SUV on the side of the road near a police cruiser and an

---

[13] The plaintiff's objection to this paragraph of the state defendants' statement of material facts, that it contains "multiple facts in violation of . . . Local R. 56(b)," is overruled.
[14] The wording of this sentence resolves the plaintiff's objection to this paragraph of the state defendants' statement of material facts.
[15] The plaintiff's objection to this paragraph of the state defendants' statement of material facts, that it contains "multiple facts in violation of . . . Local R. 56(b)," is overruled.

unmarked police car.  *Id.* ¶ 63.

When Phinney first observed the police cruisers stopped along the side of the highway, he moved from the far right lane into the adjacent lane and started slowing.  Statement of Material Facts by Defendant Aaron Phinney ("Phinney SMF") (ECF No. 47) ¶ 73; Plaintiff's Responsive SMF ¶ 73.  In his statement to police, Phinney indicated that he was traveling between 70 and 72 miles per hour when he first began to slow down and move to the left. Plaintiff's Statement of Additional Material Facts in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's SMF") (included in Plaintiff's Responsive SMF beginning at 13) ¶ 4; Defendants' Response to Plaintiff's Statement of Additional Material Facts ("Defendants' Responsive SMF") (ECF No. 56) ¶ 4.  When he first began to move from the right-hand lane, Phinney was on the phone with his girlfriend and not focusing on the cruiser and the people standing around it.  *Id.* ¶ 14.

When Phinney was approximately 100 yards away from the vehicles on the side of the highway, he saw a man running and a state trooper trying to "get a hold" of him.  State Defendants' SMF ¶ 64; Plaintiff's Responsive SMF ¶ 64.  Phinney continued to slow and attempted to move further to his left.  Phinney SMF ¶ 74; Plaintiff's Responsive SMF ¶ 74. Alexander testified that Allard paused for a moment, then, as the box truck moved into the outside lane, he ran out and lunged "right in front of the truck as it tried to swerve and avoid him."  State Defendants' SMF ¶ 67; Plaintiff's Responsive SMF ¶ 67.[16]  Allard was struck in the head by the right front quarter panel area of the box truck.  *Id.* ¶ 68.[17]  Alexander estimates that only two seconds passed between the time Allard bolted away from him and his fatal collision

---

[16] The wording of this sentence resolves the plaintiff's objection to this paragraph of the state defendants' statement of material facts.
[17] The wording of this sentence resolves the plaintiff's objection to this paragraph of the state defendants' statement of material facts.

with the box truck. *Id*. ¶ 69.

According to Teachout, Allard was thrown 30 to 60 feet from the point of impact. Plaintiff's SMF ¶ 17; Defendants' Responsive SMF ¶ 17. From the point where he first observed Phinney's box truck, Teachout estimated it took 10 to 15 seconds for Phinney to come to a stop. *Id*. ¶ 18. Allard died as a result of the injuries he sustained in the collision. *Id*. ¶ 23. Allard is the only arrestee Alexander is aware of who escaped from custody and ran into oncoming traffic on the Maine Turnpike. Defendants' SMF ¶ 71; Plaintiff's Responsive SMF ¶ 71.

At least one person who saw the collision saw Allard attempt to avoid a collision with another vehicle by jumping out of the way in a manner that was inconsistent with an individual who intended to do himself harm. Plaintiff's SMF ¶ 21; Defendants' Responsive SMF ¶ 21. The medical examiner ruled the manner of Allard's death "undetermined" because there were conflicting reports about whether Allard intended to be hit. *Id. ¶ 22.* At the time of this incident, the Maine State Police did not have a policy specifying from which side of a cruiser people must exit. *Id*. ¶ 2.[18]

### III.  Discussion

### A.  Defendant Teachout

The plaintiff responds to defendant Teachout's motion for summary judgment as follows:

> Following discovery and a review of the evidence in this case, Plaintiffs have determined that their claims against Trooper Teachout are not supported by the evidence. Accordingly, Plaintiffs hereby dismiss Counts III-IV of their complaint.

Plaintiffs' Opposition to Defendants Williams, Alexander and Teachout's Motion for Summary Judgment ("State Opposition") (ECF No. 51) at 8.

Of course, after an answer to the complaint has been filed, as was done in this case on

---

[18] The language of this paragraph of the plaintiff's statement of material facts has been altered in accordance with the defendants' qualification of it.

September 22, 2011 (ECF No. 8), dismissal of any portion of the complaint may be accomplished only by stipulation of all of the parties or court order.  Fed. R. Civ. P. 41(a); *Sullivan School Assocs., LP v. Town of Berwick*, Civil No. 2:12-cv-00157-NT, 2012 WL 3238100, at *1 (D. Me. Aug. 7, 2012).  Because the plaintiff has indicated that she does not intend to pursue her claims against Teachout, however, I recommend that the court enter summary judgment in his favor on all claims asserted against him in this action.

### B.  Defendant Alexander

The complaint asserts three counts against Alexander: violation of Allard's constitutional rights (Count I), violation of the Maine Human Rights Act, 5 M.R.S.A. § 4682 (Count II), and punitive damages (Count IX).[19]  Complaint (ECF No. 1) at 5-7, 12.  Alexander contends that he is entitled to qualified immunity on the two substantive counts; he also argues that Count II fails because it is has no factual support.  Motion for Summary Judgment by Defendants Colonel Robert Williams, Phillip Alexander, and Roger Teachout ("State Motion") (ECF No. 45) at 1. The legal standards for such claims are well-established.

Qualified immunity "provides a safe harbor for public officials acting under the color of state law who would otherwise be liable under 42 U.S. C. § 1983 for infringing the constitutional rights of private parties."  *Borges Colón v. Román-Abreu*, 438 F.3d 1, 18 (1st Cir. 2006) (quoting *Whitfield v. Melendez-Rivera*, 431 F.3d 1, 6 (1st Cir. 2005)).  Alexander's bid for qualified immunity with respect to the plaintiff's claim that he violated Allard's rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution sets in motion what the First Circuit has dubbed "a trifurcated inquiry":

> We ask, first, whether the plaintiff has alleged the violation of a

---

[19] Punitive damages are a remedy, not an independent cause of action.  Summary judgment has been entered by this court on such claims for this reason. *E.g.*, *Sandler v. Calcagni*, 565 F.Supp.2d 184, 198-99 (D. Me. 2008).  Because the defendants seek summary judgment on this claim only on its merits, I address the claim in that manner.

> constitutional right. If so, we then ask whether the contours of the right
> were sufficiently established at the time of the alleged violation. Finally,
> we ask whether an objectively reasonable official would have believed
> that the action taken or omitted violated that right.

*Acevedo-Garcia v. Monroiq*, 351 F.3d 547, 563-64 (1st Cir. 2003) (citation and internal quotation marks omitted).

Qualified immunity is an affirmative defense against damages liability which may be raised by state officials sued in their personal capacity. *See Gomez v. Toledo*, 446 U.S. 635, 639-40 (1980). The general rule of qualified immunity, set out in *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), is that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." This rule eliminates from consideration claims of the officials' subjective state of mind, such as bad faith or malicious intention, concentrating on the "objective reasonableness" of the official's conduct. "On summary judgment on qualified immunity, the threshold question is whether all the uncontested facts and any contested facts looked at in plaintiff's favor show a constitutional violation." *Buchanan v. Maine*, 469 F.3d 158, 168 (1st Cir. 2006).

The same standard applies to claims brought under the Maine Human Rights Act, *Richards v. Town of Eliot*, 780 A.2d 281, 292 (Me. 2001), and I will therefore not discuss qualified immunity separately as to Count II.

## 1. The Constitutional Right

The defendants contend that Allard had no constitutional right to be prevented from running out into traffic when Alexander was merely "assisting Mr. Allard out of the cruiser's back seat and attempting to escort him to the cruiser's front seat[.]" State Motion at 7. The plaintiff sees the alleged constitutional right at issue very differently: she says that Alexander had

a constitutionally-imposed duty to protect Allard, who was in custody at the relevant time.  State Opposition at 4-6.

The constitutional right with which the qualified immunity analysis begins must be "clearly established," that is, the contours of the right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  Failing either the existence of a recognized constitutional right or the requisite degree of clarity of that right, judgment for the defendant follows.  *Coscia v. Town of Pembroke*, 659 F.3d 37, 39 (1st Cir. 2011).

The constitutional right upon which the plaintiff bases her argument was recognized in *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989).  In that case, the Supreme Court acknowledged that "[i]t is true that in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals."  *Id*. at 198.  "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety[.]"  *Id*. at 199-200.

> The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs – *e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.  In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf – through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

*Id*. at 200 (citations omitted).

Here, Allard's ability to act on his own behalf with respect to what happened after Alexander opened the cruiser door was not restrained by Alexander and, thus, not by the state. There is simply no suggestion in the evidence submitted, let alone the possibility of a reasonable inference, that Allard could only have moved into the traffic lanes of the turnpike once the door was open.  If that were the case, Alexander, who had to be closer to the traffic than Allard in order to open the door for him, would also have been in danger of severe injury, a possibility that makes no sense.  There is not even an allegation that Alexander forced Allard into the path of oncoming traffic.

The plaintiff argues that Alexander "created a dangerous situation and/or rendered Mr. Allard more vulnerable to danger because of his handling of Mr. Allard on the side of the Maine Turnpike."  State Opposition at 5.  More specifically, she contends that Alexander did so by

> (1) removing a handcuffed passenger from the door of a police cruiser
> that faces oncoming traffic; (2) failing to maintain physical contact with
> and control of the handcuffed passenger during the transfer; (3) failing to
> shield a handcuffed arrestee from oncoming traffic; and (4) failing to
> prevent an arrestee who is handcuffed and is distraught from escaping
> and running into oncoming traffic[.]

*Id*. at 7.  However, even if these were reasonable factual inferences that could be drawn from the evidence presented, whether or not that evidence is disputed,[20] they do not rise to the level of a constitutional violation.

That there is no constitutional right to be allowed to exit a vehicle on the "safer" of two sides should be obvious.  That there is no constitutional right involved in any of the second through fourth specific ways identified by the plaintiff is made clear by relevant case law, albeit

---

[20] There is no evidence whatsoever, and none is cited by the plaintiff, to support her assertion that the cruiser was parked "mere inches from oncoming traffic" or that, when Alexander removed Allard from the side of the back seat on which he was sitting, he was "just inches from the travel lane."  State Opposition at 6.

from other jurisdictions, and the First Circuit's description of the "state-created danger" theory or doctrine, which is the basis of the plaintiff's claim here.   The First Circuit discussed the theory recently as follows:

> "As a general matter,  . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." [21] *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989).   "The *DeShaney* Court . . . recognized a limited exception to this rule which applies to circumstances in which the government has a 'special relationship' with the individual because government action has deprived that individual of the liberty needed to protect himself."  *Velez-Diaz v. Vega-Irizarry*, 421 F.3d 71, 79 (1st Cir. 2005).   This exception may apply "when the individual is incarcerated or is involuntarily committed to the custody of the state."  *Id.* at 80 (quoting *Rivera v. Rhode Island*, 402 F.3d 27, 34 (1st Cir. 2005)).   "In addition to the special 'custodial' relationships, the *DeShaney* Court suggested, but never expressly recognized, the possibility that liability might arise where the state creates or substantially contributes to the creation of a danger."  *Id.*   Regardless of whether a plaintiff proceeds under the theory that the defendants are liable because they limited his ability to protect himself (the "limitation" theory), or under the theory that they are liable because they created or substantially contributed to the danger he faced and then failed to protect him from it (the "state-created danger" theory), the defendants' actions must also "shock the conscience of the court," *Rivera*, 402 F.3d at 35, in order for the plaintiff to prevail.  *See Lockhart-Bembery v. Sauro*, 489 F.3d 69, 77 (1st Cir. 2007) (applying "shock the conscience" standard to a state-created danger claim); *J.R. v. Gloria*, 593 F.3d 73, 79 (1st Cir. 2010) (applying same standard in discussing a "limitation" theory claim).

*Meléndez-Garcia v. Sánchez* 629 F.3d 25, 36 (1st Cir. 2010) (footnote and string citation omitted).

   To the extent that the plaintiff means in this case to rely upon a "limitation" theory, there is no evidence to support a claim that Alexander deprived Allard of the liberty needed to protect himself.   Alexander, who was closer to traffic than was Allard when Alexander opened the

---

[21] The complaint in this action alleges "deliberate indifference to [the] decedent's constitutional rights in violation [of] . . . the 4th, 5th, 8th & 14th Amendments to the United States Constitution."  Complaint ¶ 47.  The plaintiff's opposition to the state motion for summary judgment addresses only Allard's alleged due process rights and appears to abandon any claims under any amendment other than the Fourteenth.

cruiser's door, did not deprive Allard of the ability to protect himself.  All Allard needed to do

was to avoid walking out into traffic.

It appears that the plaintiff intends to rely on the theory of a "state-created danger."  State

Opposition at 5-7.  That claim also fails to prevent Alexander from successfully invoking the

doctrine of qualified immunity.   First, the evidence, even interpreted as favorably to the

plaintiff's position as is reasonable, cannot be interpreted to show any action or inaction by

Alexander that shocks the conscience.

> The burden to show state conduct that shocks the conscience is
> extremely high, requiring stunning evidence of arbitrariness and caprice
> that extends beyond mere violations of state law, even violations
> resulting from bad faith to something more egregious and more extreme.

*Meléndez-Garcia*, 629 F.3d at 37 (citations and internal punctuation omitted).  At most, the

evidence in the summary judgment record demonstrates negligence on Alexander's part,

something that is well below the extreme and egregious.  *See also Boudoin v. St. Charles Parish*

*Hosp.*, Civil Action No. 07-6842, 2009 WL 602961, at *9-*10 (E.D. La. Mar. 9, 2009) (citing

absence of evidence to show that defendants affirmatively placed decedent in position of danger

or stripped him of ability to protect himself when he ran out of hospital where he had been taken

by police and entered a pond in which he drowned).

As to the state-created danger theory, "the estate must demonstrate that the state greatly

increased the danger to [the decedent] while constricting access to self-help; it must cut off all

avenues of aid without providing a reasonable alternative.  Only then may a constitutional injury

have occurred."  *Estate of Stevens v. City of Green Bay*, 105 F.3d 1169, 1177 (7th Cir. 1997).  In

this case, it certainly cannot be said that Allard had no reasonable alternative to "enter[ing] the

travel portion of the Maine Turnpike following his arrest." State Opposition at 5.   Nor does a

police officer have a duty to seize a handcuffed person who is in custody and suddenly moves

16

away from the officer.  "The Fourth Amendment does not guarantee a right to be seized.  It certainly does not guarantee a fleeing prisoner's right to be seized during an escape attempt." *Purvis v. City of Orlando*, 273 F.Supp.2d 1321, 1328 (M.D. Fla. 2003).

No reasonable person in Allard's position would have moved into the travel lanes of the Maine Turnpike.  Alexander cannot be held liable for his failure to foresee that Allard would do so.  Allard was certainly entitled under the Constitution, as the plaintiff asserts, to "life, liberty and the pursuit of happiness," State Opposition at 7, but the state is liable for his loss of any of those rights only when it acts, or fails to act, in a manner that deprives a citizen of that right. Here, Alexander did no such thing.  Further, there is not, as the plaintiff would have it, a "clearly established [constitutional] right to police protection[,]" *id.*, under the circumstances of this case.

Because Alexander is entitled to qualified immunity on the plaintiff's federal claim, he is entitled to summary judgment on the plaintiff's claim under the Maine Human Rights Act as well.

## C.  Defendant Williams

Counts V and VI of the complaint allege that defendant Williams "sets the policies and procedures for the training of Maine State Police officers," Complaint ¶ 64, and that Alexander was "inadequately trained, supervised and[]/or disciplined," resulting in the deprivation of Allard's constitutional rights.  *Id.* ¶¶ 65-67.  A supervisor's liability under 42 U.S.C.  § 1983 arises when the behavior of his subordinates results in a constitutional violation and his own action or inaction was affirmatively linked to that behavior and could be characterized as encouragement, condonation, acquiescence, or gross negligence amounting to deliberate indifference.  *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 902 (1st Cir. 1988).

Because I have concluded that the plaintiff has failed to provide evidence to support a

conclusion that Alexander violated any of Allard's constitutional rights, I recommend that the court enter summary judgment on the training and supervisory claims against defendant Williams. *See, e.g., Calvi v. Knox County*, 470 F.3d 422, 429 (1st Cir. 2006); *Brown v. Ferrara*, No. 2:10-cv-00523-GZS, 2011 WL 1637928, at *8 (D. Me. Apr. 28, 2011). *See generally Cote v. Town of Millinocket*, No. 01-10-cv-00481-JAW, 2012 WL 4510664, at *32-*33 (D. Me. Sept. 28, 2012).

### D. Defendant Phinney

Count VII of the complaint alleges negligence against defendant Phinney, who was the driver of the vehicle that struck Allard. Complaint ¶¶ 73-74. Count VIII alleges that he negligently inflicted emotional distress on the plaintiff. *Id*. ¶¶ 77-79. Phinney moves for summary judgment on these claims, contending that the plaintiff cannot provide evidence to support either count. Defendant Aaron Phinney's Motion for Summary Judgment ("Phinney Motion") (ECF No. 48) at 1.

#### 1. Count VIII

In Count VIII, the plaintiff seeks to recover for her own emotional distress, caused by witnessing the death of her brother and his pain and suffering before his death. Complaint ¶¶ 78-79. Phinney correctly points out, Phinney Motion at 5, that, because she did not witness the incident that caused her brother's injuries, the plaintiff cannot recover under Maine law. *Cameron v. Pepin*, 610 A.2d 279, 284-85 (Me. 1992).

The plaintiff does not respond to this portion of Phinney's motion. Plaintiff's Opposition to Defendant Aaron Phinney's Motion for Summary Judgment ("Phinney Opposition") (ECF No. 52). Nonetheless, applicable law requires the court to consider the merits of the motion as to this count rather than automatically granting the unopposed motion for summary judgment. *United*

18

*States v. Kearsley*, 831 F.Supp.2d 376, 378 (D. Me. 2011). However, I have no difficulty in concluding, under the circumstances, that Phinney is entitled to summary judgment on Count VIII of the plaintiff's complaint.

### 2. Count VII

The parties agree on the legal standard applicable to the plaintiff's negligence claim against Phinney. Phinney Motion at 3; Phinney Opposition at 2. Under Maine law, a claim of negligence requires a plaintiff to establish duty, breach, causation, and damages, or, in other words, "a duty owed, breach of that duty, and an injury to the plaintiff that is proximately caused by a breach of that duty." *Mastriano v. Blyer*, 2001 ME 134, ¶ 11, 779 A.2d 951, 954. There is a legal duty to operate a motor vehicle safely. *Id*. Violation of a safety statute does not constitute negligence *per se*, but is evidence of a breach of the duty imposed by that statute. *Binette v. Dyer Library Ass'n*, 688 A.2d 898, 904 (Me. 1996).

Specifically, the plaintiff claims that Phinney violated the speed limit and the statutory duty to exercise due care to avoid colliding with pedestrians. Phinney Opposition at 3. The evidence which the plaintiff interprets as demonstrating that he breached these duties, she contends, is sufficient to prevent the entry of summary judgment on this claim. *Id*. at 3-4. On the other hand, Phinney cites the Maine statute prohibiting a pedestrian from suddenly walking or running into the path of a vehicle that is so close that it is impossible for the driver to yield, and the Maine Turnpike's rules barring pedestrians from the roadway and setting a minimum speed of 45 miles per hour. Phinney Motion at 3-4.

Maine motor vehicle statutes also require that an operator exercise due care to avoid colliding with a pedestrian notwithstanding the prohibition on pedestrians suddenly walking or running into the path of the operator. 29-A M.R.S.A. § 2056(8)(A).

19

The plaintiff offers the following as evidence that would allow a factfinder to find in her favor on her claim of negligence:

1.  Phinney "was traveling in the right hand lane, driving in excess of the speed limit and talking on his cell phone when he first noticed 'somebody pulled over in the breakdown lane ahead of him.'"

2.  Although Phinney saw a police cruiser and a policeman on the side of the road with another man, "he was not really paying attention to them."

3.  Phinney did not focus on the cruiser or the people standing around it until he was close enough to see the cruiser doors open.

4.  Phinney was still traveling at a high rate of speed when he collided with Allard.

5.  The medical examiner who performed Allard's autopsy understood that Allard had been struck by a vehicle traveling at 60 to 70 miles per hour and testified that his injuries were consistent with being struck at that speed.

6.  Teachout testified that there was a discrepancy as to where on the highway Allard was struck and whether his body came to rest in the middle lane or the right-most lane of the highway.

7.  The medical examiner was unable to conclude whether Allard had committed suicide. She testified that there were conflicting eyewitness reports as to whether Allard was trying to avoid being hit.

Phinney Opposition at 4-5.

The fifth factual assertion is partially incorrect.  It is supported by paragraph 10 of the plaintiff's statement of material facts, which in turn is not supported by the citation given to the

summary judgment record, as Phinney points out in his response.   Phinney Responsive SMF ¶ 10.   *See* [Excerpts from] Deposition of Margaret Greenwald, M.D.  (ECF No. 53-6) at 38.

Phinney presents the following facts in support of his motion:

1.  Allard broke free from Alexander and ran onto the Turnpike.

2.  It appeared to Phinney and Alexander that Allard "leaped into the side of Defendant Phinney's truck[.]"

3.  "In the short period of time he observed . . . Allard running away from . . . Alexander onto the Turnpike, [Phinney] slowed his truck and attempted to move to the left and avoid" colliding with Allard.

4.  "Troopers at the scene . . . concluded that there was nothing Defendant Phinney could have done to avoid impact with . . . Allard."

5.  The medical examiner testified that Allard's injuries were also consistent with impact with a truck traveling at a speed less than 60 to 70 miles per hour.

6.  Alexander testified that Allard was in the middle lane of the Turnpike when Alexander observed Phinney turning to the left in an attempt to avoid striking him.

Phinney Motion at 4; Defendant Aaron Phinney's Reply to Plaintiff's Opposition to Defendant Phinney's Motion for Summary Judgment (ECF No. 55) at 3-4.

While the question is a close one, the summary judgment standard requires the court to interpret the properly supported factual assertions of the plaintiff as demonstrating the existence of a material factual dispute if a reasonable factfinder could resolve the dispute in favor of the plaintiff.  By that standard, the plaintiff has provided sufficient evidence, though barely, to allow her to proceed to trial.

Phinney is not entitled to summary judgment on Count VII.

### 3.  Punitive Damages

Phinney also seeks summary judgment on the plaintiff's claim for punitive damages against him.  Phinney Motion at 5-6.  Under Maine law, punitive damages are available only upon clear and convincing evidence that a defendant acted with malice or that his conduct was so outrageous that malice may be implied.  *Tuttle v. Raymond*, 494 A.2d 1353, 1360-61 (Me. 1985).

The plaintiff contends that, because Phinney "was speeding through an emergency zone and, by his own admission, failing to pay attention to the road or to the scene that was unfolding in front of him[,]" she should be able to present this claim at trial.  Phinney Opposition at 6. There are at least two problems with her statement of the evidence: she has not provided evidence that Phinney was speeding at the time of the impact; and she has not provided evidence that Phinney was not paying attention in time to attempt to avoid striking Allard.  While she may have provided sufficient evidence of negligence to take her negligence claim to trial, the evidence in the summary judgment record falls considerably short of the much-higher evidentiary standard required to prove malice.  Neither of the two cases cited by the plaintiff, *id*. at 6-7, *Lehouillier v. East Coast Steel, Inc.*, 13 F.Supp.2d 109 (D. Me. 1998), and *C-K Enters., Inc.*, 438 A.2d 262 (Me. 1981) (a pre-*Tuttle* case), requires a different conclusion here, where the summary judgment evidence of Phinney's actions, even considered in the light most favorable to the plaintiff, fails to rise to the level found in *Tuttle* to be insufficient to support an award of punitive damages.

### IV.  Conclusion

For the foregoing reasons, I recommend that the state defendants' motion for summary judgment (ECF No. 45) be **GRANTED**, and that defendant Phinney's motion for summary judgment (ECF No. 48) be **GRANTED** as to Count VIII of the complaint and any claim for

punitive damages, and otherwise **DENIED**.  Remaining for trial if this recommended decision is

adopted with be Count VII of the complaint, which is asserted only against defendant Phinney.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 31st day of October, 2012.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge